Hough, J.
The claim is made, among others, that there was no evidence to show that Bitner intended to sell or dispose of the milk, after it had gone through its final process, without complying with the provisions of the law in reference to marking.
The bill of exceptions shows that two samples of milk were taken from two separate cans as the milk *524 was being poured from those cans into the weighing vat. This represented two samples of milk from the producer. Three per cent, butter fat content is the minimum provided for and required bylaw. Sample No. 1 tested 8 3/10 per cent, butter fat, and sample No. 2 tested 0.2. It is apparent of course that sample No. 1 was greatly in excess of the legal requirement, and that sample No. 2 was greatly inferior to the legal requirement. Sample No. 3 was taken as the milk passed from the 50-gallon vat to the 500-gallon vat, and it tested 3.5 per cent. fat. The food inspector, prosecuting witness in the case, then walked downstairs and waited an interval, which he says was about five or six minutes, and then took sample No. 4, which was a bottled and capped half-pint of milk. The milk in this bottle of course had traveled through the entire chain of appliances, and had undergone the different processes that were used in the preparation and standardization of the product. With great quantities of milk being poured into the receiving vat and transmitted and mixed with other milk in a 500-gallon receptacle, and then descending by gravity through the pipes and other appliances and undergoing other processes, it would seem that there could be no assurance that any part of either original, sample of milk would be contained in a half-pint bottle, such as sample No. 4.
Section 12716, General Code, provides as follows:
“In all prosecutions under this chapter, if milk' is shown upon analysis to contain more than eighty-eight per cent, of watery fluid, or to contain less *525 than 12 per cent, of solids or three per cent, of fats, it shall be deemed to be adulterated.”
The next section, 12717, provides a penalty for the sale of adulterated milk.
Section 12719, General Code, provides a penalty for the sale of milk represented to be pure milk, from which any part of the cream has been removed, and Section 12720, General Code, being the section under which the prosecution in this case was had, reads as follows:
“Whoever sells, exchanges, delivers or has in his custody or possession with intent to sell, exchange or deliver, milk from which the cream or part thereof has been removed, unless "in a conspicuous place above the cénter and upon the outside of each vessel, can or package, from which or in which such milk is sold, the words 'skimmed milk’ are distinctly marked in uncondensed gothic letters not less than one inch in length, shall be fined,” etc.
Adulterated milk is defined, and its sale is made unlawful. This amounts to a permission to sell milk - of a composition above that defined as adulterated. By; the terms of Section 12720 one may not sell milk from which any part of the cream has been removed, without its being marked “skimmed milk.” This brings us to this situation: pure milk as such may be sold; adulterated milk as defined may not be sold; anything between these two classes may be sold if marked “skimmed milk.”
The milk in sample 4 tests 3.45 per cent., and is the result of mixing various milks together, and of a refining and purifying process, and shows a per cent, of fat content above adulterated milk; but who *526 can say that it is less than pure milk under Section 12719?
If sample No. 4 were a mixture of samples 1 and 2, it could be said that- through the process of agitation and mixture, the fat content of sample No. 1 had been reduced, and the fat content of sample No. 2 had been built up.
The method used by the state in developing this branch of its case would certainly call for an identification, or rather proof, that the milk or part of it contained in sample No. 4 was the same as that contained in the other samples. Whether or not this has been accomplished is a matter of very serious doubt. In view of the fact, however, that the record presents another more serious difficulty, it is probably not necessary or profitable to pursue this branch of the discussion further. We find that the testimony closed with the taking of the sample of the bottled product, and that no proof of any kind or character was offered to show what was done or contemplated between the time the bottle was capped and the time it would be offered for sale.
It is apparent that in the process of the manufacture of the milk for sale- as above described, it being subjected to the various processes mentioned, the cooling process is an .essential element in its preparation for consumption, and that the product would be unfit for public use without the cooling or refrigerating process cannot be doubted. The record is clear upon this subject, pointing out that the milk is not offered for sale or delivery until refrigeration has taken place for several hours, and nothing appears in the record to show whether or *527 not the bottles of milk are marked in pursuance to the requirements of the statute after refrigeration and before sale.
“One who sells, exchanges, or delivers” may be found guilty under this section, but clearly the sale, exchange or delivery would be an essential element to complete the offense. The section, however, goes further, and provides that one who “has in his custody or possession with intent to sell, exchange or deliver” may be found guilty. It may be said that the intent to sell, exchange, or deliver was present as applied to any one of the samples taken. The company was engaged in the business of buying milk in its natural state, putting it through these various processes, and in disposing of it in one way or another for public consumption. But it must be remembered that each one of the samples was taken at an incomplete stage of manufacture. It is perfectly apparent that samples 1 and 2, although eventually for sale, and at that time within, the custody and possession of the company with that intent in' view, could not reasonably be expected to be marked as required by this statute, and what is true in that regard respecting samples 1 and 2 is equally true in respect to sample No. 4, as it was taken likewise during the process of preparing the milk for the market. And if this sample under the requirements of Section 12720, General Code, must of necessity be marked “skimmed milk” to comply with the terms of the law, then certainly samples 1 and 2, along the same line of reasoning, would have to be marked in the same manner. Such a *528 construction would of course be unreasonable and absurd.
An act of the legislature will be construed to be constitutional if it is susceptible of such construction. The words of the statute, “has in his custody or possession with intent to sell, exchange or deliver,” must refer to a product that has passed the various stages of manufacture, and has become a completed, finished product, ready for the market. Without such construction, the statute itself would not pass the test of constitutionality, .and, as above stated, we are beholden to the rule of construction that will render the act constitutional if that construction can be reasonably given. In this case, this may be done, and we hold that there is an absolute failure of proof in this respect, and that the motion made at the close of the state’s case should have been sustained.
The case is reversed and remanded to the police court of the city of Springfield, Ohio, for further proceedings in accordance with this opinion.

Judgment reversed.

Marshall, C. J., Johnson, Robinson and Matthias, JJ., concur.
Jones, J., took no part in the consideration or determination of the case.